## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LABORERS' PENSION FUND and** | ) | |
| **LABORERS' WELFARE FUND OF THE** | ) | |
| **HEALTH AND WELFARE DEPARTMENT** | ) | |
| **OF THE CONSTRUCTION AND GENERAL** | ) | |
| **LABORERS' DISTRICT COUNCIL OF** | ) | |
| **CHICAGO AND VICINITY, and JAMES S.** | ) | |
| **JORGENSEN, Administrator of the Funds,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No.  08 C 33** |
| **v.** | ) | |
| | ) | **Judge Manning** |
| **KASHMERE CONSTRUCTION, INC.,** | ) | |
| **a dissolved Michigan corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MOTION FOR ENTRY OF DEFAULT JUDGMENT IN SUM CERTAIN

Plaintiffs, Laborers' Pension Fund and Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively "Funds") and James S. Jorgensen (hereinafter "Jorgensen"), Administrator of the Funds, by their attorney, Jerrod Olszewski, respectfully move an Entry of Default Judgment in Sum Certain against Defendant Kashmere Construction, Inc. (hereinafter the "Company").  In support of this Motion, Plaintiffs state as follows:

1.      Plaintiffs filed their Complaint on January 2, 2008 seeking to compel the Company to pay benefits and dues delinquencies as revealed by an audit for the period of August 10, 2005 through May 31, 2006, including liquidated damages, interest, audit costs, and attorneys fees and costs.

2.    Summons and Complaint were personally served upon the Defendant on January 9, 2008. A true and accurate copy of the Summons and Affidavit of Service is attached hereto as Exhibit A.

3.    Defendant has failed to file an Answer or otherwise plead. Accordingly, Defendant is in default.

4.    As set forth in the Affidavit of Joseph Gilleran, filed contemporaneously herewith and attached hereto as Exhibit B, pursuant to the Agreement, and the Funds' respective Agreements and Declarations of Trust, the Funds are entitled to the delinquent contributions, liquidated damages and interest on the late amounts, and audit costs. See Exhibit B, ¶ ¶ 1 through 6.

5.    Pursuant to Section 502(g)(2) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1132(g)(2), Section 301 of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. §185, the Agreement, and the Funds' respective Agreements and Declarations of Trust, the Funds are entitled to judgment in the amount of $9,575.89 against Defendant Kashmere Construction, Inc. as follows:

a.    $8,299.07 in delinquencies, liquidated damages, interest, and audit costs for the audit period of August 10, 2005 through May 31, 2006. See Exhibit B, ¶ ¶ 5 and 6.

b.    As set forth in the Declaration of Jerrod Olszewski filed contemporaneously herewith and attached hereto as Exhibit C, $1,276.82 in attorneys' fees and costs expended in this matter.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in Plaintiffs' favor and against Defendant Kashmere Construction, Inc. in the amount of $9,575.89 as follows:

A.　For $8,299.07 in delinquencies, liquidated damages, interest, and audit costs for the audit period of August 10, 2005 through May 31, 2006;

B.　For $1,276.82 representing attorneys' fees and costs; and

C.　Ordering Defendant to pay post judgment interest in all amounts due from the date of judgment until the judgment is satisfied.

February 5, 2008

Respectfully submitted,

Laborers' Pension Fund, et al.

By: /s/ Jerrod Olszewski

Patrick T. Wallace
Jerrod Olszewski
Christina Krivanek
Amy N. Carollo
Charles Ingrassia
Laborers' Pension and Welfare Funds
Sub Office, 111 W. Jackson Blvd., Suite 1415
Chicago, IL 60604
(312) 692-1540

AO 440 (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**SUMMONS IN A CIVIL CASE**

LABORERS' PENSION FUND AND LABORERS'
WELFARE FUND OF THE HEALTH AND
WELFARE DEPARTMENT, ETC., ET AL.,

V.

KASHMERE CONSTRUCTION, INC., a
dissolved Michigan corporation,

CASE NUMBER:

ASSIGNED JUDGE:

DESIGNATED
MAGISTRATE JUDGE:

# 08 C 33

**JUDGE MANNING
MAGISTRATE JUDGE DENLOW**

TO: (Name and address of Defendant)

Kashmere Construction, Inc.
c/o Troy A. Luberda, Registered Agent
7591 N. River Road
Freeland, MI 48623

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Patrick T. Wallace, Jerrod Olszewski
Christina Krivanek, Amy N. Carollo
Charles F. Ingrassia
Office of Fund Counsel
53 W. Jackson Blvd., Suite 550
Chicago. IL  60604

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this
summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint.  You must also file your answer with the Clerk of this Court within a reasonable period of time
after service.

**Michael W. Dobbins, Clerk**

**(By) DEPUTY CLERK**

**January 2, 2008**

**Date**



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

**LABORER'S PENSION FUND, ET AL.**

COURT DATE:

PLAINTIFF(S)

Case No.
08 C 33

VS.

**KASHMERE CONSTRUCTION, INC.**

AFFIDAVIT OF SERVICE OF:
**SUMMONS & COMPLAINT**

DEFENDANT(S)

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On **Jan 09, 2008**, at **12:33 PM**, I served the above described documents upon **KASHMERE CONSTRUCTION, INC.** as shown below:

**CORPORATE SERVICE** was made by leaving a true and correct copy of the documents with **VALERIE LUBERDA / VICE PRESIDENT**, an officer, managing agent or authorized agent of the within named company.

Said service was effected at **7591 N RIVER ROAD, FREELAND, MI 48623.**

**DESCRIPTION:**  Gender: **F**  Race: **WHITE**  Age: **50**  Hgt: **5'9"**  Wgt: **160**  Hair: **BLACK**  Glasses: **NO**

I declare under penalties of perjury that the information contained herein is true and correct.

**Mark Jankowski**, Lic #: 117-001119
**Judicial Attorney Services, Inc.**
**2100 Manchester Rd., Ste 900**
**Wheaton, IL 60187**
**(630) 221-9007**

SUBSCRIBED AND SWORN to before me this 10th day of January, 2008

NOTARY PUBLIC

JAMIE L. GANNON
NOTARY PUBLIC - MICHIGAN
SAGINAW COUNTY
MY COMMISSION EXPIRES 11/8/2011

CLIENT NAME:
Laborers Pension and Welfare Funds*
FILE #:

ORIGINAL PROOF OF SERVICE

TRACKING #
35836

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LABORERS' PENSION FUND and )
LABORERS' WELFARE FUND OF THE )
HEALTH AND WELFARE DEPARTMENT )
OF THE CONSTRUCTION AND GENERAL )
LABORERS' DISTRICT COUNCIL OF )
CHICAGO AND VICINITY, and JAMES S. )
JORGENSEN, Administrator of the Funds, )
                              )
                 Plaintiffs, )      Case No.  08 C 33
     v. )
                              )      Judge Manning
KASHMERE CONSTRUCTION, INC., )
a dissolved Michigan corporation, )
                              )
               Defendant. )

## AFFIDAVIT OF JOSEPH GILLERAN

JOSEPH GILLERAN, being first duly sworn on oath, deposes and states as follows:

1.      I am a Field Representative employed by the Laborers' Pension Fund and

the Laborers' Welfare Fund of the Construction and General Laborers' District Council

of Chicago and Vicinity (hereinafter collectively referred to as the "Funds"), Plaintiffs in

the above-referenced action.  My responsibilities include oversight of the collection of

amounts owed by Defendant Kashmere Construction, Inc., (hereinafter "Company").

This Affidavit is submitted in support of the Laborers' Funds' Motion for Entry of

Default Judgment in Sum Certain.  I have personal knowledge regarding the statements

contained herein.

2.      On September 7, 2005, the Company signed an Independent Construction

Industry Collective Bargaining Agreement ("Memorandum") with the Construction and

General Laborers' District Council of Chicago and Vicinity ("District Council") and



Laborers' Local Union No. 75. A true and accurate copy of the Memorandum is attached hereto as Exhibit B-1. Pursuant to the terms of the Memorandum, the Company is bound to the terms of the relevant collective bargaining agreements incorporated by reference in the Memorandum ("Agreement(s)") and the Funds' respective Agreements and Declarations of Trust.

3.     Pursuant to agreement, the Funds have been duly authorized to act as collection agents on behalf of the District Council for union dues owed to the District Council.

4.     The Agreement and the Funds' respective Agreements and Declarations of Trust, to which the Company is bound, require that the Company submit benefit and union dues reports and contribution payments by the tenth day of the following month. Payments which are not received within thirty days of this date are assessed liquidated damages in the amount of 10 per cent of the principal amount of delinquent contributions, and interest at a rate of prime plus 2 per cent as charged by the JP Morgan Chase Bank from the date of delinquency forward. The Agreement and the Funds' respective Agreements and Declarations of Trust also obligate the Company to submit its books and records to the Funds for periodic audits to determine benefit contribution compliance. A copy of the relevant portions of the Agreement is attached as Exhibit B-2; a copy of the relevant portions of the Amended Agreement and Declaration of Trust creating the Laborers' Pension Fund is attached as Exhibit B-3; a copy of the relevant portions of the Amended Health and Welfare Department of the Construction and General Laborers' District Council is attached as Exhibit B-4; and a copy of the Agreement and Declaration

of Trust Establishing the Construction and General Laborers' District Council of Chicago

and Vicinity Training Trust Fund is attached hereto as Exhibit B-5.

   5.      An audit of the Company's books and records was conducted for the time

period of August 10, 2005 through May 31, 2006.  The audit revealed the following

delinquencies:

| | |
|---|---|
| Welfare Fund | $3,148.74 |
| 10% Liquidated Damages | $   314.87 |
| Interest | $   577.36 |
| Pension Fund | $1,808.46 |
| 10% Liquidated Damages | $   180.85 |
| Interest | $   331.59 |
| Training Fund | $     78.03 |
| 10% Liquidated Damages | $       7.80 |
| Interest | $     14.29 |
| Dues | $   400.11 |
| 10% Liquidated Damages | $     40.01 |
| LDCLMCC | $   101.16 |
| 10% Liquidated Damages | $     10.12 |
| Interest | $     18.70 |
| MCIAF | $     32.13 |
| 10% Liquidated Damages | $       3.21 |
| Interest | $       5.92 |
| LECET | $     42.15 |
| 10% Liquidated Damages | $       4.22 |
| Interest | $       7.80 |
| CISCO | $       4.59 |
| 10% Liquidated Damages | $        .46 |
| Interest | $        .81 |
| TOTAL | $7,133.38 |

   A true and accurate copy of the audit is attached hereto as Exhibit B-6.  A true

and accurate copy of my audit summary sheet is attached hereto as Exhibit B-7.

   6.      The cost of the audit was $1,165.69.

FURTHER AFFIANT SAYETH NAUGHT.

_Joseph Gilleran_
Joseph Gilleran

Subscribed and sworn to before me
this 5 day of February, 2008
_Susan M. Diforti_
Notary Public

```
"OFFICIAL SEAL"
Susan M. Diforti
Notary Public, State of Illinois
My Commission Expires Oct. 5, 2008
```



# CONSTRUCTION & GENERAL LABORERS'
## DISTRICT COUNCIL OF CHICAGO AND VICINITY
AFFILIATED WITH THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO

101 BURR RIDGE PARKWAY • SUITE 300 • BURR RIDGE, IL 60527 • PHONE: 630/655-8289 • FAX: 630/655-8853

## INDEPENDENT CONSTRUCTION INDUSTRY COLLECTIVE BARGAINING AGREEMENT

It is hereby stipulated and agreed by and between _____ ["Employer"] and the Construction and General Laborers' District Council of Chicago and Vicinity, Laborers' International Union of North America, AFL-CIO ["Union"], representing and encompassing its affiliated Local Unions, including Local Nos. 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269, 288, 582, 681, 1001, 1006, 1035, 1092, together with any other Local Unions that may come within the Union's jurisdiction ("Local Union"), and encompassing the geographic areas of Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone counties, Illinois, that:

**1. Recognition.** The Employer, in response to the Union's request for recognition as the majority 9(a) representative of its Laborer employees, and the Union's offer to show evidence of its majority support, hereby recognizes the Union under Section 9(a) of the Act as the sole and exclusive collective bargaining representative for the employees now and hereinafter employed in the bargaining unit with respect to wages, hours and other terms and conditions of employment without the need for a Board certified election...

**2. Labor Contract.** The Employer affirms and adopts the applicable Collective Bargaining Agreements...

**3. Dues Checkoff.** The Employer shall deduct from the wages of employees' uniform working dues in the amount of 1.5% of gross wages...

**4. Work Jurisdiction.** This Agreement covers all work within the Union's work jurisdiction...

**5. Fringe Benefits.** The Employer agrees to pay the amounts that it is bound to pay under said Collective Bargaining Agreements to the Health and Welfare Department...

**6. Wages and Industry Funds.** The Employer shall pay all the negotiated hourly wages, fringe benefit and industry fund contributions it is bound to pay...

**7. Contract Enforcement.** All grievances arising hereunder shall, at the Union's discretion, be submitted to the Chicago District Council Grievance Committee...

**8. Successors.** In the event of any change in the ownership, management or operation of the Employer's business...

**9. Termination.** This Agreement shall remain in full force and effect from June 1, 2001...

**10. Execution.** The Employer acknowledges and accepts the facsimile signatures on this contract as if they were his original signatures...

Dated: 9-9 _____, 20 05

ACCEPTED:

Laborers' Local Union No. _____ 75

By: _____ Will. R. Diez _____

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY

By: _____
Frank Riley, President and Secretary-Treas.

By: _____
James P. Connolly, Business Manager

For Office Use Only:

_____ Kashmere _____

FEIN No.: 35-2251147

By: Jared Niedzwied VP
(Print Name and Title)

Jared Niedzwied
(Signature)

1100 Suite # Washington St
(Address)

Freeland Mi 48623
(City, State and Zip Code)

989 692-2900 / 989 692 2800
(Telephone/Telefax)

WHITE - LOCAL UNION • CANARY - TRUST FUND • PINK - DISTRICT COUNCIL • GOLD - EMPLOYER

EXHIBIT B-1

JUNE 1, 2006 TO MAY 31, 2010

BUILDING AGREEMENT

between the

BUILDERS' ASSOCIATION

MASON CONTRACTORS' ASSOCIATION
OF GREATER CHICAGO

LAKE COUNTY CONTRACTORS ASSOCIATION

Represented by the

MID-AMERICA REGIONAL BARGAINING ASSOCIATION

and the

CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL
OF CHICAGO AND VICINITY



EXHIBIT
B-2

# INDEX

| Article | Page |
|---|---|
| TERMS OF CONTRACT...................................... | 1 |
| I EQUAL OPPORTUNITY................................. | 2 |
| II HOURS AND OVERTIME.............................. | 2 |
| Paragraph 1................................... | 2 |
| Paragraph 2................................... | 2 |
| Paragraph 3................................... | 2 |
| Paragraph 4................................... | 2 |
| Paragraph 5................................... | 2 |
| III MULTIPLE SHIFTS................................. | 3 |
| Paragraph 1................................... | 3 |
| Paragraph 2................................... | 3 |
| Paragraph 3................................... | 3 |
| Paragraph 4................................... | 3 |
| Paragraph 5................................... | 3 |
| Paragraph 6................................... | 3 |
| IV SUNDAYS, HOLIDAYS AND ELECTION DAYS............. | 3 |
| Paragraph 1................................... | 3 |
| Paragraph 2................................... | 4 |
| Paragraph 3................................... | 4 |
| Paragraph 4................................... | 4 |
| V UNION SECURITY.................................. | 4 |
| VI CHECK-OFF & DUES DEDUCTIONS..................... | 4 |
| Paragraph 1................................... | 4 |
| Paragraph 2................................... | 5 |
| Paragraph 3................................... | 5 |
| Paragraph 4................................... | 5 |
| Paragraph 5................................... | 5 |
| VII SUBCONTRACTING.................................. | 5 |
| Paragraph 1................................... | 5 |
| Paragraph 2................................... | 5 |
| Paragraph 3................................... | 6 |
| VIII WAGES.......................................... | 6 |
| Paragraph 1................................... | 6 |
| Paragraph 2- Welfare.......................... | 8 |
| Paragraph 3- Pension.......................... | 8 |

| **Article** | | **Page** |
|---|---|---|
| | Section 415 Excess Benefit Fund...... | 10 |
| | Chicagoland Laborers' Vacation Fund.. | 10 |
| | Chicagoland Laborers' Annuity Fund... | 10 |
| Paragraph 3A – Fox Valley Funds, Reciprocity.... | | 10 |
| Paragraph 4 – Supervisors..................... | | 11 |
| Paragraph 5 – Out of Town Work ............... | | 11 |
| Paragraph 6 – Special Rules for Bonding......... | | 11 |
| IX | BONDING.............................................. | 12 |
| | Paragraph 1......................................... | 12 |
| | Paragraph 2......................................... | 12 |
| | Paragraph 3......................................... | 12 |
| | Paragraph 4......................................... | 12 |
| X | INDUSTRY FUND/SAFETY FUND......................... | 13 |
| | Paragraph 1......................................... | 13 |
| | Paragraph 2......................................... | 13 |
| | Paragraph 3......................................... | 13 |
| | Paragraph 4......................................... | 13 |
| XI | PARTICULAR WORK RULES AND CLARIFICATION OF CONDITIONS....................................... | 13 |
| | Paragraph 1......................................... | 14 |
| | Paragraph 2......................................... | 16 |
| | Direct Deposit................................. | 16 |
| | Paragraph 3......................................... | 17 |
| | Paragraph 4......................................... | 17 |
| | Paragraph 5......................................... | 17 |
| | Paragraph 6......................................... | 17 |
| | Paragraph 7......................................... | 17 |
| | Paragraph 8 – Hiring Hall....................... | 17 |
| XII | STEWARDS............................................ | 18 |
| | Paragraph 1......................................... | 18 |
| | Paragraph 2......................................... | 18 |
| | Paragraph 3......................................... | 18 |
| | Paragraph 4......................................... | 19 |
| XIII | REPORTING FOR WORK................................. | 19 |
| | Paragraph 1......................................... | 19 |
| | Paragraph 2......................................... | 19 |
| | Paragraph 3......................................... | 19 |
| XIV | PAYDAY.............................................. | 20 |

**Article**                                                                    **Page**

            Paragraph 1.......................................    20
            Paragraph 2.......................................    20

XV     TRAINING APPRENTICE PROGRAM......................    20
            Paragraph 1 – Apprentice Committee.............    20
            Paragraph 2 – Apprenticeship and Training Fund...    20
            Paragraph 3.......................................    20
            Paragraph 4.......................................    21
            Paragraph 5 ......................................    21
            Paragraph 6 ......................................    21

XVI    SETTLEMENT OF DISPUTES...........................    21
            Paragraph 1.......................................    21
            Paragraph 2.......................................    21
            Paragraph 3.......................................    22
            Paragraph 4.......................................    22
            Paragraph 5.......................................    22
            Paragraph 6.......................................    22

XVII   BRANCHES OF WORK.................................    22
            Paragraph 1.......................................    22
            Paragraph 2.......................................    22
            Paragraph 3.......................................    23
            Paragraph 4 – Recognition of Bargaining
                Representative...............................    23
            Paragraph 4(a) – Branches of Work
                Covered Herein...............................    23
            Paragraph 5 – Work Not Included................    29
            Paragraph 6 – Wrecking........................    30
            Paragraph 6(a) – Wrecking:
                Complete Demolition..........................    30
            Paragraph 7 – Flying Forms....................    30

XVIII  ALCOHOL AND SUBSTANCE ABUSE....................    30

XIX    PRE-JOB CONFERENCES..............................    30

XX     APPROVALS........................................    31
            Paragraph 1.......................................    31
            Paragraph 2.......................................    31
            Paragraph 3 – Saving Clause....................    31
            Paragraph 4 – Employer's Warranty.............    31
            Paragraph 5 – Execution........................    31

ADDENDUM..............................................    33

## JUNE 1, 2006 TO MAY 31, 2010

## BUILDING AGREEMENT

### between the

## BUILDERS' ASSOCIATION

## MASON CONTRACTORS' ASSOCIATION
## OF GREATER CHICAGO

## LAKE COUNTY CONTRACTORS ASSOCIATION

### Represented by the

## MID-AMERICA REGIONAL BARGAINING ASSOCIATION

### and the

## CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL
## OF CHICAGO AND VICINITY

### TERM OF CONTRACT

This AGREEMENT entered into this 1st day of June, 2006, for Cook, DuPage, Lake, Will, Grundy, Kendall, Kane, McHenry and Boone Counties by and between the BUILDERS ASSOCIATION, the MASON CONTRACTORS' ASSOCIATION OF GREATER CHICAGO, and the LAKE COUNTY CONTRACTORS ASSOCIATION represented by the MID-AMERICA REGIONAL BARGAINING ASSOCIATION, hereinafter referred to as EMPLOYER, and CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, hereinafter referred to as the UNION, shall remain in full force and effect until 11:59 p.m. on May 31, 2010.

If either party wishes to modify this Agreement, it shall serve written notice by certified or registered mail, upon the other party not less than sixty days prior to May 31, 2010 of its intent to begin negotiations for a new Agreement. In the absence of the service of such notice, this Agreement shall automatically renew itself, together with all amendments and improvements as negotiated after said initial expiration date, by and between the parties in area-wide bargaining, from year to year thereafter.

# Article I
# EQUAL OPPORTUNITY

The parties agree that Employees will not be discriminated against because of race, creed, religion, color, age, sex or national origin.

The masculine gender has been used in this Agreement to facilitate ease of writing and editing and therefore the masculine gender shall include the feminine gender. Whenever the words "he", "him", "his", or "man" is used, they shall be read and construed as "he or she", "him or her", "his or hers", and "man or woman", respectively.

# Article II
# HOURS AND OVERTIME

**Paragraph 1.**  When one shift is used, eight (8) hours per day, between 8:00 a.m. and 4:30 p.m. from Monday through Friday, shall constitute the normal work day and straight time shall be paid. In weeks that have designated holidays that fall during the regular work week, but not more often than six (6) times per year, the Employer may schedule four (4) consecutive ten (10) hour days at straight time. The Union and the Employees must be informed and the Union must give permission to the Employer in writing.

**Paragraph 2.**  Starting times may be adjusted by the Employer, upon notice to and clearance by the Union, from 6:00 a.m. to 9:00 a.m. at straight time.

**Paragraph 3.**  At the option of the Employer, the starting time for the day, or the first shift can be flexible.

It is the Employer's responsibility to inform the Employee and obtain clearance from the Union of any change in starting time prior to quitting time the day before such change is to be effective. The first eight (8) hours' work shall be paid at straight time, the next 2½ hours at time and one-half and double time thereafter.

**Paragraph 4.**  When one night shift is used to perform emergency work which cannot be done during the normal work day, such work shall be paid for a time and one-half for the first eight (8) hours, and double time thereafter.

**Paragraph 5.**  Overtime rates on single shift work starting at 8:00 a.m. Saturday, shall be time and one-half for the first eight (8) hours, and thereafter double time shall be paid until 8:00 a.m. Monday, unless changed by Paragraph 2 above. During the period between December 1 and March 15, Saturday may be used as make-up day at straight time while tending masons whose Local Unions observe similar conditions; provided, however, that after forty (40) hours have been worked, time and one-half will be paid.

## Article III
## MULTIPLE SHIFTS

**Paragraph 1.**  When it is necessary that the contractor use more than one shift for a period of three (3) or more consecutive days, the Union shall be notified twenty-four (24) hours in advance of the effective date of the starting of such multiple shift operations.

**Paragraph 2.**  On Multiple Shift arrangements, the work week shall start at 12 o'clock midnight Sunday, and continue until 11:59 p.m. Friday.  In no event shall regular working hours of different shifts overlap.

**Paragraph 3.**  When three (3) eight (8) hours shifts are used, the workmen shall receive eight (8) hours' pay for seven and one-half (7½) hours worked; one-half hour being allowed for eating.  Employees shall receive eight (8) hours pay under this Section even if they are permitted to leave after seven and one-half (7-1/2) hours, and it shall be a violation of this Agreement if an employee does not receive eight (8) hours pay.  Employees who work eight (8) hours on a shift without receiving one-half hour lunch shall receive, in addition to the eight (8) hours pay as provided in this Section, one (1) hour's pay at the applicable premium rate.

**Paragraph 4.**  When two twelve (12) hour shifts are used, an eating period of one-half hour shall be allowed each shift without deductions in pay and all time in excess of eight (8) hours shall be paid at the regular overtime rates, that is to say, and two and one-half (2½) hours immediately following the first eight (8) hours shall be paid for at the rate of time and one-half, and double time thereafter.  Employees who work one of two twelve (12) hour shifts without receiving a one-half hour lunch shall receive, in addition to the twelve (12) hours pay as provided in this Section, one-half hour's pay at the applicable premium rate.

**Paragraph 5.**  When two eight (8) hour or two ten (10) hour shifts are used, an eating period of one-half (½) hour shall be allowed, but not paid for, but all time in excess of eight (8) hours worked shall be paid at the regular overtime rates, as set forth in Paragraph 4 of this Article.

**Paragraph 6.**  On Saturday, other than single time shift, shift work shall start at 12:01 a.m. and the first eight (8) hours of each shift shall be paid for at the rate of time and one-half, and thereafter double time shall be paid; however, under no conditions shall more than eight (8) hours be worked at the rate of time and one-half on any one shift.

## Article IV
## SUNDAYS, HOLIDAYS AND ELECTION DAYS

**Paragraph 1.**  All work performed on Sundays or on the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day, or on Mondays when such holidays are celebrated, shall be paid for at the double time rate.  There shall be no work performed on Labor Day, excepting in case of dire emergency, and with the

written consent of the President of the District Council. If a holiday falls on a Sunday, it shall be celebrated on the following Monday. If a holiday falls on a day other than Sunday, it shall be celebrated on that date.

**Paragraph 2.** On Election Days, the individual employed in this trade shall be allowed time not to exceed two (2) hours, without pay, for the purpose of voting, provided that the worker on the job has given notice to the Employer or his agent and has made arrangements no less than twenty-four (24) hours in advance, to receive such time off.

**Paragraph 3.** When a holiday falls on Monday through Friday, make-up days on Saturday shall be paid at time and one-half for the first eight (8) hours and double time thereafter.

**Paragraph 4.** In weeks that have designated holidays that fall during the regular work-week, but not more often than six (6) times per year, the Employer may schedule four (4) consecutive ten (10) hour days at straight time. The Union and the Employees must be informed and the Union must give permission to the Employer in writing.

**Article V**
**UNION SECURITY**

All new Employees shall be required to join the Union after the expiration of seven (7) days of employment or seven (7) days after the execution date of this Agreement, whichever is later, and shall remain members of the Union in good standing as a condition of continued employment.

Good standing shall mean payment of the initiation fees and both working and non-working dues uniformly required as a condition of acquiring or retaining membership in a Local Union.

Employees covered by this Agreement at the time it is signed, and who are members of the Union at that time, shall be required as a condition of continued employment, to continue membership in the Union for the duration of this Agreement.

Employees covered by this Agreement at the time it has been signed, and who are not members of the Union at that time shall be required to join the Union seven (7) days after the date of execution of this Agreement and remain members of the Union in good standing for the duration of this Agreement.

**Article VI**
**CHECK-OFF & DUES DEDUCTIONS**

**Paragraph 1.** Employers also agree to deduct from the net earnings payable to an Employee covered by this Agreement, initiation fees and quarterly Union dues insofar as permitted by state and federal laws upon receipt and in accordance with a duly executed authorization form

4

from the Employee. Said authorization form shall not be revocable for a period of more than one (1) year or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 2.** All Employers covered by this Agreement shall deduct from the wages of Employees covered by said contract, working dues in the amount of one and three-quarters percent (1.75%) of gross wages or such amount approved by the Union for each hour worked and shall remit monthly to the Union office the sums so deducted, together with an accurate list of Employees from whose wages said dues were deducted and the amounts applicable to each Employee, not later than the 10th day of the month next following the month for which such deductions were made. Dues remittance reports shall include a report of the hours worked and wages earned by each Laborer. Employers who fail to timely remit Union dues shall be assessed an additional ten percent (10%) liquidated damages.

**Paragraph 3.** It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and that such deductions be made only pursuant to written assignments from each Employee on whose account such deductions are made, which assignment shall not be revocable for a period of more than one (1) year, or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 4.** The Union agrees that it will indemnify and hold harmless the Employer from any and all claims, suits, causes of action, or otherwise, as regards the creation and administration of the dues check-off established by this Article and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys' fees on behalf of the beneficiaries of such indemnity.

**Paragraph 5.** Should any Employer fail to remit dues to the Union as required under this Agreement, the Employer shall be liable for and pay all costs of collection, including reasonable audit expenses and reasonable attorney fees and costs. The Union may file suit, or remove employees that it represents, or both, for non-remittance or underpayment of dues by an Employer.

### Article VII
### SUBCONTRACTING

**Paragraph 1.** On work covered by this Agreement, the contractor or subcontractor agrees to see that all subcontractors on work within the Union's jurisdiction on this job site adhere to the wages and fringes contained in this Agreement when the subcontract is let by the contractor or subcontractor. If, upon the Union's request, the subcontractor chooses to sign a current labor agreement with the Union (although such signing might not be required under Paragraph 1), then the contractor shall be relieved of any liability under this Paragraph 1.

**Paragraph 2.** The Employer agrees that it will not contract or subcontract any work covered by this Agreement to be done at the site of construction, alteration, painting or repair of a building, structure of other work, except to a person, firm or corporation that is party to the ap-

plicable collective bargaining agreement with the Union.

**Paragraph 3.**  If an Employer, bound to this Agreement, contracts or subcontracts any work covered by this Agreement to be done at the jobsite of the construction, alteration, painting or repair of a building, structure or other work to any person or proprietor who is not signatory to this Agreement, the Employer shall require such subcontractor to be bound by all the provisions of this Agreement, or the Employer shall maintain daily records of the subcontractor's or the subcontractor's Employees jobsite hours and be liable for payments to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, the Laborers' Pension Fund, and the Construction and General Laborers' District Council of Chicago and Vicinity Joint Apprentice and Training Trust Fund.


### Article VIII
### WAGES

**Paragraph 1.**  The rates of wages exclusive of fringe benefits to be paid in this trade for the period June 1, 2006 to and including May 31, 2010, shall be as set forth below for the respective following classifications as further defined herein.

The wage rates include a total economic increase of $2.90 per hour effective June 1, 2006 to May 31, 2007 for a wage rate of $31.55 per hour, which includes the dues deduction;  June 1, 2007 to May 31, 2008, $3.00 per hour total economic increase to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion;  June 1, 2008 to May 31, 2009, $3.00 per hour total economic increase to be allocated between wages and fringe benefits and other funds by the Union in its sole discretion;  June 1, 2009 to May 31, 2010, $3.10 per hour total economic increase to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion.  The foregoing allocations may include allocations to LECET and LDC/LMCC.

For the economic increases listed above, the Union shall also have discretion to allocate to another fund(s) to be established, up to a maximum of thirty cents ($ .30) per hour over the term of the Agreement (up to twelve cents ($ .12) in the first year and up to eighteen cents ($ .18) over the remaining years).  The fund(s) shall indemnify and hold harmless Employers who have assigned their bargaining rights to a MARBA-represented Association for purposes of collective bargaining with the Union, and the MARBA-represented Associations party to this Agreement, and MARBA, as regards the creation, implementation and operation of the fund(s), other than the obligation to contribute the designated amounts to the fund(s), and such indemnity and hold harmless shall include the payment of all reasonable costs and attorney's fees actually incurred on behalf of the employer.  The Employer shall give prompt notice to the fund(s) of any claims asserted or suits filed that are subject to indemnification.

| CLASSIFICATION | 6/1/06 | 6/1/07 | 6/1/08 | 6/1/09 |
|---|---|---|---|---|
| Building Laborers................. | $31.55 | $3.00 | $3.00 | $3.10 |

6

Fire BrickWork and Boiler
  Settler Laborers................. 31.875
Jackhammerman (On
  Firebrick Work Only)......... 31.825
Boiler Setter Plastic
  Laborers............................. 32.00
Chimney Laborers (Over
  40 Feet).................. .......... 31.65
Chimney on Firebrick............ 31.90
Scaffold Laborers................. 31.65
Caisson Diggers................... 31.90
Jackhammerman................... 31.775
Power Driven Concrete Saws,
  Other Power Equipment..... 31.775
Stone Derrickman and
  Handlers............................. 31.75
Fireproofing and Fire
  Shop Laborers.................... 31.55
Well Point System Men......... 31.90
Pumps for Dewatering, other
  Unclassified Laborers.......... 31.55
Windlass and Capstan
  Person................................ 31.70
Cement Gun Nozzle
  Laborers (Gunite).............. 31.70
Cement Gun Laborers.......... 31.625
Plaster Laborers................... 31.55

to be allocated between wages and fringe benefits by the Union in its sole discretion. (See above paragraph)

Material Testing Laborer I
(Hand coring and drilling for testing of materials; field inspection of uncured concrete and asphalt).................................... 21.55
Material Testing Laborer II
(Field Inspection of welds, structural steel, fireproofing, masonry, soil, facade, reinforcing steel, formwork, cured concrete, and concrete and asphalt batch plants; adjusting proportions of bituminous mixtures.)............ 26.55

Apprentice (1st 6 Months).... 18.93
Apprentice (2nd 6 Months)... 22.085
Apprentice (3rd 6 Months).... 25.24
Apprentice (4th 6 Months).... 28.395
Apprentice (5th 6 Months).... 31.55

    Sub-Foremen shall receive $.45 premium wages over and above top Laborers' Scale under his supervision.

    Building Labor Foremen, General Foremen and Superintendents shall receive $.75 premium wages over and above top Laborers' Scale under his supervision.

**Dosimeter Use**  A premium of One ($1.00) Dollar per hour shall be paid to any Laborer required to work with a dosimeter used for monitoring nuclear exposure or with any similar instrument or measuring device.

**Power Pac**  When a Laborer uses a power driven piece of equipment he shall be paid the rate of pay of the tool at the end of the power pac.

**Paragraph 2. WELFARE:**  Beginning the period from June 1, 2006 to May 31, 2007, the Employer agrees to make Health and Welfare contributions of $7.46 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages herein stipulated. This $7.46 per hour shall be paid to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity or a designated appointee at the end of each month.

That for the periods June 1, 2007 to May 31, 2008; June 1, 2008 to May 31, 2009; June 1, 2009 to May 31, 2010; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article VIII, Paragraph 1)

The Employer agrees to bound by the Agreements and Declarations of Trust establishing the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, as well as any amendments thereto.

**Paragraph 3. PENSION:**  Beginning June 1, 2006 the Employer agrees to make a pension contribution of $4,84 per hour for each hour worked by all Employees covered by this Agreement in addition to the wages and welfare payments herein stipulated. This $4.84 per hour shall be paid to the Laborers' Pension Fund or to a designated appointee at the end of each month.

That for the periods June 1, 2007 to May 31, 2008; June 1, 2008 to May 31, 2009; June 1, 2009 to May 31, 2010; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article VIII, Paragraph 1)

The Union will allocate a minimum of fifty-cents ($ .50) per hour from the total economic increase over the contract term, which includes twenty cents ($ .20) per hour in the first contract year, which will be dedicated only toward reduction in the Laborers' Pension Fund unfunded liability and will not be used to fund benefit improvements. The foregoing does not limit the allocation of additional contributions for increased benefits based on actuarial cost projections.

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' Pension Fund, as well as any amendments thereto.

The parties agree that the Employer shall make lump sum contributions to employee fringe benefit accounts, administered by the Trustees on behalf of each employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

Further, in the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement, including the obligation to remit Union Dues under Article VI.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the

examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

Article III Section 2 of the trust agreements of the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund shall be amended to include the following: "Association-appointed Trustees must be full-time employees of Contributing Employers within the Association's membership. A Contributing Employer shall be defined as an Employer that has employed an average of five (5) or more Laborers performing bargaining unit work for whom contributions have been made per month in each of the previous three (3) calendar years."

The parties agree that the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund will be operated and administered by a board of trustees that is expanded to include 8 employer and 8 union trustees. Appointing authority for the two additional employer trustees shall be vested with new employer associations that currently are not party to the trust agreements and under whose labor agreements more than 20,000 hours of benefits were paid in 2005.

**Section 415 Excess Benefit Fund.** A Section 415 Excess Benefit Fund shall be established for the purpose of providing alternative benefit to any employees of the Employer who become unable to receive the entire amount of the accrued pension benefits to which they would be entitled under one or more of the pension plans sponsored by their Employer because of limitations established by Section 415 of the Internal Revenue Code. The Employer may be required and directed by the Board of Trustees of the Excess Benefit Fund to contribute a portion of its agreed-upon "pension" contribution to the Section 415 Excess Benefit Fund and shall not increase the Employer's cost beyond the amount that the Employer is obligated to contribute to the Laborers' Pension Fund and that the funding of the Section 415 Excess Benefit Fund shall be fully tax deductible to the Employer for Federal Income Tax purposes. The Employer hereby agrees that the Board of Trustees of any such Section 415 Excess Benefit Fund shall be authorized to determine each year the amount that will be contributed by the Employer and the amount to be credited to the account of any eligible retiree for payment in lieu of accrued benefits that would exceed the limits set by Section 415 of the Internal Revenue Code.

**Chicagoland Laborers' Vacation Fund.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Vacation Fund, a jointly-trusteed vacation plan established for the purpose of providing income to members during their winter layoffs. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Chicagoland Laborers' Annuity Fund.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Annuity Fund, a jointly-trusteed defined contribution plan providing a supplemental retirement benefit. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Paragraph 3.A. FOX VALLEY FUNDS, RECIPROCITY.** Employers that employ Employ-

ees who participate in the Fox Valley Laborers' Health and Welfare Fund and Fox Valley and Vicinity Laborers' Pension Fund (collectively "Fox Valley Funds") may contribute directly to these funds in the amounts allocated for the Fox Valley Funds by the Union from the economic package.

Effective June 1, 2006 such an Employer shall contribute for each hour worked $7.20 per hour to the Fox Valley Laborers' Health and Welfare Fund and $5.10 per hour to the Fox Valley and Vicinity Laborers' Pension Fund ($12.30 per hour in total). The Union in its sole discretion, shall determine the division of additional contributions to be allocated from the economic package to the Fox Valley Funds in future years, provided that the total amount to be allocated is the same as the total amount allocated to the Health and Welfare Department of the Construction and General Laborers District Council of Chicago and Vicinity and the Laborers Pension Fund.

Employers contributing to the Fox Valley Funds agree to be bound by the Agreements and Declarations of Trust establishing the Fox Valley Funds, as well as any amendments thereto.

The parties agree that, whenever contributions are made on behalf of an Employee to welfare and pension funds that are not the home funds of the Employee, the funds receiving such contributions, in accordance with the funds' Reciprocity Agreement, shall transfer such contributions to the home funds and the home funds shall reallocate the contributions between such home funds in the amounts set forth herein.

**Paragraph 4. SUPERVISORS:** To the extent permissible by the Internal Revenue Service or any Federal Act, and for the purposes of Paragraphs 2 and 3 of Article VIII of this Agreement only, the bargaining unit shall also include those persons in the employ of an Employer who are supervisors, as defined in the Labor Management Relations Act, as amended; and who at one time were Employee members of the bargaining unit herein on whose behalf contributions were required to be made to the trust funds described in the aforesaid Paragraph 2 and 3 of Article VIII hereof.

**Paragraph 5. Out of Town Work.** When Laborers who reside or work in the nine-county geographic area covered by this Agreement are asked to work at locations outside these nine counties, the Employer shall continue to report and pay benefits for all hours worked outside the nine counties. If the work performed is covered under a labor agreement with the Laborers' International Union of North America or its affiliates, the Employer shall report and pay the benefit contributions to the fringe benefit fund identified, and the contribution rates specified, under that labor agreement. If the work performed is not covered under a labor agreement with the Laborers' International Union of North America or its affiliates, then the Employer shall report and pay the benefit contributions to the fringe benefit funds identified, and the contributions rates specified, under this Agreement.

**Paragraph 6. Special Rules for Bonding.** An employer that is owned or managed, in whole or part, by an individual who currently has or previously had in the last ten (10) years ownership or principal managerial responsibility for another contributing employer that currently is or ceased doing business when delinquent to the Funds shall be required to post for the benefit of the Funds an additional cash bond or obtain a surety bond from a Fund-approved insurer in an

amount equal to twice the amount of the other contributing employer's delinquency.  This amount may be adjusted by the Benefit Fund Trustees for each individual employer.  This bond shall be in addition to and separate from the bond required elsewhere in this Agreement.

## Article IX
## BONDING

**Paragraph 1.**  All Employers shall procure, carry and maintain a surety bond in form and amount satisfactory to the Union, but not less than in the principal sum of $5,000.00, to guarantee payment of wages, Pension and Welfare Trust contributions, during the term of this Agreement.

**Paragraph 2.**  If the Employer employs between seven (7) and ten (10) Laborers, the surety bond shall be increased to $15,000.  If the Employer employs between eleven (11) and twenty (20) Laborers, the surety bond shall be increased to $25,000.  If the Employer employs twenty-one (21) to forty (40) Laborers, the surety bond shall be increased to $35,000.  If the Employer employs forty-one (41) or more Laborers, the surety bond shall be increased to $45,000.

**Paragraph 3.**  The Employer shall be required to obtain an appropriate bond within thirty (30) days of executing this Agreement, which bond may also be posted in cash.  Should the Employer fail to comply with the provisions of this Article, the Union may withdraw its employees or strike until such compliance occurs, and the Employer shall further be liable for all costs, including attorneys fees, incurred in enforcing these provisions.

**Paragraph 4.**  The Employer shall give notice to the Union and the appropriate Fund Office in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(a)    Formation of Partnerships;

(b)    Termination of business;

(c)    Change of name commonly used in business operation;

(d)    Change in form of business organization;

(e)    Incorporation of business;

(f)    Dissolution of corporation;

(g)    Name and business organization of successor;

(h)    Admission to or withdrawal from any association operating as a multi-employer bargaining unit.

## Article X
## INDUSTRY FUND

**Paragraph 1.**  Each Employer shall pay into the Mid-America Regional Bargaining Association Industry Advancement Fund (hereinafter sometimes referred to as the "Industry Fund"), or such other fund as MARBA may in its sole discretion designate at any time during the term of this Agreement, the amount of six cents ($ .06) for each hour worked for the Employer by those of his Employees covered by this Agreement.

Each Employer shall pay into the Chicago-Area Laborers-Employers Cooperation and Education Trust ("LECET"), the amount of five cents ($ .05) for each hour worked for the Employer by those of his Employees covered by this Agreement.

Each Employer shall pay into the Laborers' District Council  Labor Management Cooperation Committee ("LDC/LMCC"), the amount of twelve cents ($ .12) for each hour worked for the Employer by those of his Employees covered by this Agreement.

Each Employer shall contribute one cent ($ .01) per hour for each hour worked by his/her employees covered by this Agreement to the Construction Industry Service Corporation ("CISCO"), a not for profit corporation.

**Paragraph 2.**  The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Industry Fund, as well as any amendments thereto, and agrees to be bound by all actions taken by the Trustees of said Industry Fund pursuant to said Agreement and Declaration of Trust and amendments thereto.  The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the LECET and LDC/LMCC, as well as any amendments thereto.

**Paragraph 3.**  Inasmuch as the existence and utilization of this Industry Fund should result in increased construction and, therefore, in increased construction job opportunities for Employees, the Union agrees to cooperate in assuring that the contributions required by this Article are in fact made by Employers bound by this Agreement.

**Paragraph 4.**  For the period June 1, 2006 to May 31, 2010, each Employer shall contribute one cent ($.01) per hour for each hour worked by his employees covered by this Agreement to the Chicagoland Construction Safety Council, a not for profit corporation.

## Article XI
## PARTICULAR WORK RULES AND
## CLARIFICATION OF CONDITIONS

**Paragraph 1.** (a) Building Laborers' scale shall apply to all work performed by the Laborers except as specifically classified.

(b) Boiler Setter Laborers will include all work of handling solid refractory materials and also fire brick work in boiler setting, open hearth, furnace, blast furnace, soaking pits, tanks, dust catchers, coke oven batteries, furnace chimneys and stacks, including cleanup work on the above services.

(c) Boiler Setter Plastic Laborers applies to work of actually installing plastic, in connection with the boiler work or other non-solid refractory materials. Mortar mixers, lancers, burners, etc., plus all work from point of forty (40) feet above normal ground level in fire brick work and Boiler Setters Laborers' Classifications.

Minimum safety measures for Boiler Setters are that all scaffolding, in and around blast furnaces and hot stoves, etc., shall not exceed five (5) feet per landing and be constructed of solid-type materials, except the large cable-type used in blast furnaces, and at least every fourth scaffold shall be left in place to serve as a safety scaffold with ladders extending to safe distance above each landing. The Employer shall furnish respirators, safety goggles, gloves and other protection materials necessary in and about dusty and hot working conditions during all furnace work.

(d) Caisson Diggers applies to all caisson work and men working in trenches, foundation pits and piers eight (8) feet or more in depth below the level that excavation begins in such trenches, foundation pits or piers.

Where hazardous conditions exist when excavating trenches, foundation pits or piers or where a type of soil, sand or other material being removed creates a hazardous condition for the Employee such trenches, foundation pits or piers must be shored or sheathed, and the Employees performing the work of shoring and sheathing shall be paid the caisson rate.

Where hazardous conditions do not exist, but sheathing or shoring is necessary solely for the purpose of protecting a bank or preserving the work, then caisson rates shall not apply.

When specifications show the depth of such excavation to exceed eight (8) feet, said caisson rate shall apply from the start of excavation when hand dug. For safety reasons, no worker shall be permitted to work alone if excavation exceeds five (5) feet, unless he is working under direct supervision.

(e) Chimney Laborers (over forty (40) feet) applies to all freestanding chimneys in excess of forty (40) feet above the ground level. The Chimney Laborers' rate shall apply for the entire height of the chimney, both erecting or wrecking such chimney.

Free-standing chimneys shall be construed as chimneys built from the ground up, outside the building, for industrial, commercial or institutional purposes. It is understood that this provi-

sion does not apply in the erection of ordinary chimneys for apartment buildings, etc., unless the chimneys go forty (40) feet above the roof level.

(f)    Jackhammermen:  The rate for Jackhammermen herein established shall apply to any mechanically operated tool over thirty-five (35) pounds in weight, used in demolition, concrete breaking, tamping or other similar work.  The regular building Laborers' rate shall apply to all lighter mechanical tools.

(g)    Scaffold Laborers:  Applies to all Laborers engaged in installing, relocating and/or removing all swinging, tubular and other types of scaffolds designed and used for tending to or servicing our allied trades.  The raising and lowering of swinging and specifically designed scaffolds by hand, by power, or by any other process, is not included in scaffold Laborers' rates.

(h)    Stone Derrickmen and Handlers:  Applies to all Laborers engaged in helping the stone setters set and distribute dimensional cut stone, terra cotta, granite or prefabricated materials replacing or substituted for cut stone, etc.

(i)    Windlass and Capstan Persons:  Applies to all hoisting units attached to mixers or movable equipment used to raise material where regular hoists cannot be erected or used.

(j)    Fireproofing and Fire Shop Laborers: applies to Fireproofing beams, ceilings and walls, etc., in connection with gunite work or any other process, including clean-up work on job site, shops or yards.

(k)    Cement Gun Nozzle Laborers: (Gunite) Applies to Laborers handling nozzle in application of gunite.

(l)    Cement Gun Laborers:  Applies to Laborers handling cement gun on concrete work.

(m)    Plasterer Laborers: Applies to all Laborers as agreed upon in the Agreement with the Chicagoland Association of Wall and Ceiling Contractors, and Construction and General Laborers' District Council of Chicago and Vicinity.

(n)    Laborers who are engaged in the work of construction or wrecking of silos, etc., for grain elevators, and are required to strip or wreck forms as hazardous heights in this work shall be paid chimney Laborers' rates.

(o)    On salamander work or heating for frost prevention work, the building Laborers' rates of wages shall apply for the first eight (8) hours' work regardless of starting time Monday through Friday of each week.  All hours worked on Saturday, Sunday or Holidays, and all hours worked after eight (8) hours per day, or forty (40) hours per week Monday through Friday, as above set forth, shall be paid for at one and one-half times the Building Laborers' rate of wages.

(p)    Where services are performed by Laborers as watchmen, and such Laborers shall not be engaged in the performance of any other branches of work covered by this Agreement, they shall be paid not less than $1.50 below the Building Laborers' rate.

(q)    **Foremen:**  There shall be a Laborer appointed as Labor Foreman when five (5) or more Laborers are employed on any one job or project; there shall be sub-foreman after the first ten (10) Laborers, and for each multiple of five (5) Laborers employed thereafter to properly supervise the various phases of the work. A  Sub-Foreman shall receive $.45 premium wages above the regular wages paid those Laborers under his supervision, plus established overtime rates.  When a Labor Foreman is needed to supervise Laborers such Labor Foreman shall receive $.75 or more premium wages above top labor scale, as mutually agreed between said Labor Foreman and his Employer.

The above and foregoing shall not be so construed as to restrict the Employer's right to pay higher premium wages or appoint a greater percentage of foremen and/or sub-foremen.

(r)    The Employer shall furnish any necessary protective medication, such as petroleum jelly, to prevent burns from creosote or chemicals which may prove injurious to the skin.

(s)    On a job site requiring a Tool Shanty, said Tool Shanty shall be tended by a Laborer if Employer determines tending is required.

(t)    Portable Water Pumps shall be tended by Laborers if Employer determines tending is required.

(u)    In any instance where a machine replaces only the work of Laborers, said machine shall be operated by a Laborer if so determined by the Employer.

(v)    Any building 125 feet high or more shall require the use of a Man Cage.

**Paragraph 2.**  Wages must be paid by payroll check and shall include a stub or statement showing the number of straight time and overtime hours worked and rate of pay.  Failure on the part of the Employer to have sufficient funds at the bank to meet pay checks issued workers, shall deprive such Employers henceforth from the right to pay by checks and Joint Grievance Committee shall assess such Employer a sum equal to not less than the expense incurred in the collection of the amounts due because of such insufficient funds to meet checks so issued.

**Direct Deposit.**  In lieu of paying wages by payroll check, the Employer may make payment by electronic bank draft if the employee voluntarily accepts such alternate method of payment.  The Employer shall not mandate electronic banking as a condition of employment.  Electronic wage payments must be transferred to the employee's bank account no later than the employee's regular pay day and at no cost to the employee.  If payment is made by electronic bank draft, the Employee must also be provided a record of hours worked, rates of pay, and deductions made, at the same time and containing the same information as if wages were paid by payroll check.

If full wages are not timely transferred to the employee's account, the Employer shall pay the employee an additional four (4) hours pay for each day or portion thereof until full wages are received. Employers who violate the provisions of these paragraphs shall be denied the use of electronic banking for wage payments.

**Paragraph 3.** The Union agrees that the Employees whom it represents will accept and demand the wages and fringe benefit payments set forth in this Agreement, and the employer agrees to pay the wages and fringe benefit payments herein stipulated.

Claims for Shortages: Claims by Employees for shortages must be made within three (3) weeks after shortage is discovered.

**Paragraph 4.** Payment by the Employer and acceptance by the Employee of less than the wage herein stipulated shall be a violation of this Agreement upon the part of each. Upon conclusive proof to the Joint Grievance Committee of such violation, the Employer shall immediately pay the unpaid balance due in accordance with the wage herein stipulated; and in addition thereto, shall pay the Joint Grievance Committee an amount equal to the penalties provided in the appropriate Article of General Conditions of this Agreement, but under no circumstances shall such penalties be less than fifty (50) percent of the amount of such pay shortage as just and liquidated damages because of such violation.

Upon conclusive proof that the Employer is guilty of paying less than the wages herein stipulated, then nothing in this Agreement shall be construed to take from the Union the right to remove workers it represents from the job, and henceforth to deny such Employer further right to the employment of its members.

Members of the Union who are found guilty of violation of this Agreement shall be dealt with by the Employer.

**Paragraph 5.** The Union reserves and shall have the right to remove its employees from any job upon the failure of the Employer to pay the wages due any of its Employees or fringe benefits which may be due by reason of the hours of employment.

**Paragraph 6.** The Employer hereby agrees to maintain proper temporary toilet and drinking facilities accessible to all Employees on the job.

**Paragraph 7.** The Employer shall furnish a suitable place, properly heated when reasonably necessary, where Laborers may eat and change their clothes.

**Paragraph 8. HIRING HALL:** No agreement on the request of the Union for the establishment of an exclusive Hiring Hall has been consummated. Therefore, the question of establishing a Hiring Hall is hereby reserved for the future consideration of the parties. Upon service of sixty (60) days' notice in writing upon Employer from Union, such question shall be taken up for discussion and further negotiation by the parties hereto.

## Article XII
## STEWARDS

**Paragraph 1.** The parties agree that the following basic principles apply to the selection of a Job Steward:

(1) The Union requires that a Steward must fully protect the interest of the Union.

(2) The Employer requires that the Steward be a Laborer who can efficiently perform his duties as a Laborer and will not disrupt the job unnecessarily in discharging his duties as a steward.

(3) To meet the two basic principles agreed to by the parties, it is further agreed:

(a) The Job Steward shall be a working Laborer;

(b) The Steward shall be selected by the Business Manager of the Union with jurisdiction over the job;

(c) In selecting a Steward preference shall be given to Union members presently employed in the bargaining unit of the Employer on the specific site, provided, however, that if, in the judgment of the Business Manager, no presently employed Union member is competent to act as Steward, the Steward shall be selected from outside the bargaining unit. A reason shall be given by the Business Manager why no member is competent. However, the reason shall not infringe upon the right of the Business Manager to select the Steward; and

(d) The Union shall have the right to replace any steward at any time.

**Paragraph 2.** The Steward shall be subject to the same terms of employment as any other Employee, but taking into consideration that the Steward should be present during all working hours, all possible overtime work shall be assigned to all Stewards, if the Stewards do not replace another Laborer from that other Laborers' previously assigned duties.

**Paragraph 3.** The duties of the Steward shall include the checking of terms and conditions of work, safety conditions, starting dates of employment for new Laborers, whether Union or Non-Union, and report same to the Business Manager who appointed him. All Laborers employed on a job or project shall report to the Steward any differences or disputes which may arise in connection with the work or any part of it, and the Steward shall report same to the office of the Union. If it becomes necessary to discharge or lay off any Laborers because of completion of the work or otherwise, the Laborer appointed and acting as Steward shall not be discharged or laid off while other Laborers remain employed on the job or project as long as he is competent to perform the work. Nothing herein contained shall in any way restrict the right of any Employer to discharge a Steward for cause, upon notification to the Business Manager of the Local Union who appointed the Laborer to act as Steward.

**Paragraph 4.**  Whenever one or more Laborers are required to work overtime, one of these Laborers shall be the regular designated Steward if he is competent to do the work required or if he cannot work, he will call the Business Manager; and the Business Manager will designate someone on this job to act as Steward.

## Article XIII
## REPORTING FOR WORK

**Paragraph 1.**  Any Laborer reporting for work upon order expressed or implied by the Employer or his Agent and not put to work for any reason, except weather conditions, fire, accident or other unavoidable cause, shall receive four (4) hours' pay for lost time.  Weather conditions shall be an exception to the requirement for "show up" or reporting pay provided the Employer has notified the Employee by telephone or has required in writing that the Employee call before he departs from home.  The Employer must provide a definite and available phone number and must post this provision on each job site.  When Laborers are directed to wait during inclement weather by the Employer, his Superintendent or Labor Foreman, they shall be paid for such waiting time.

When placing monolithic concrete, an Employee's eating period can be adjusted, but not beyond one-half (½) hour before or after the regular scheduled time.  Double time shall be paid if no eating period is permitted between shifts.

Any person other than a regular Employee who is called for temporary work for just a portion of one day, and who works more than four (4) hours in any one day, shall receive equivalent of not less than eight (8) hours' pay for said day, unless such Employee is prevented from completing a day's work because of inclement weather, in which case the Employee shall be paid for the time actually worked.

**Paragraph 2.**  In case of an accident requiring medical attention during working hours, Laborers shall be permitted to go for or be taken for medical attention at once, and shall be paid for lost time that day.

In the event such injured Laborer is permitted to continue working by the doctor, but is required to return for periodic medical attention during working hours by the insurance physician or company doctor, such injured Laborer shall be paid for lost time, but not to exceed two (2) hours' pay for such visit to the doctor.

**Paragraph 3.**  The Employer agrees that no punitive action shall be taken against their Employees, if said Employees refuse to cross a picket line that may be placed on the job or project of their Employer.

## Article XIV
## PAYDAY

**Paragraph 1.** It is agreed that Employees shall be paid before quitting time on Wednesday of each week, except when the regular payday is on a Legal Holiday, in which case they shall be paid the day before such holiday at quitting time and except when Monday or Tuesday is a legal holiday, in which event the Employees may be paid on Thursday.

**Paragraph 2.** Wages are to be paid in full up to seventy-five (75) hours preceding payday. An Employee quitting of his own accord shall be paid on the next regular payday. An Employee discharged or laid off shall be paid in cash or check on the job at the time he is laid off or be given a time check calling for four (4) additional hours to cover traveling time. Such additional hours are to be added at the time of giving check and shall be paid on presentation at the office of the Employer. If same is not promptly paid upon arrival at the office, and he is required to remain there during working hours, he shall be paid for such time -Sundays and Holidays excepted.

## Article XV
## TRAINING AND
## APPRENTICE PROGRAM

**Paragraph 1. APPRENTICE COMMITTEE:** MARBA and the Union shall create a Joint Apprenticeship Training Committee (JATC), consisting of three (3) management and three (3) Union appointees to draft a trust agreement, hire staff, develop apprenticeship standards and oversee implementation of the apprentice program. The Employer hereby adopts and shall be bound by the agreement and declaration of trust established by the JATC for the apprentice program, together with any amendments thereto, which are incorporated by reference herein. The JATC shall have authority to set and enforce penalties for violations of the apprenticeship rules.

**Paragraph 2. APPRENTICESHIP AND TRAINING FUND:** The Employer shall contribute seventeen cents ($.17) per hour for each hour worked from June 1, 2006 to May 31, 2007 for all Employees covered under this Agreement to the Construction and General Laborers' District Council of Chicago and Vicinity Apprenticeship and Training Fund payable to the Training Fund or a designated appointee at the end of each month and such additional sums as the Union may designate in its sole discretion from its total economic package on June 1, 2007, 2008 and 2009 under this Agreement. The terms of the trust establishing the Fund are incorporated by reference herein and all terms regarding auditing, assessment, non-payments and grace periods as set out in the Collective Bargaining Agreement regarding payment of Welfare and Pension Fund contributions shall apply as if fully set forth herein for the Construction and General Laborers' District Council of Chicago and Vicinity Apprenticeship and Training Fund.

**Paragraph 3.** The term of apprenticeship shall be 2,400 hours, or two years, whichever occurs later, or such other duration as is mutually agreed by the Training and Apprenticeship Fund trustees. All Health and Welfare, Pension, Training Fund, Industry Advancement and

other contributions required under this Agreement will commence immediately upon employment of an apprentice. Union affiliation will be required after seven (7) days of employment.

**Paragraph 4.** The wages per hour paid to apprentices shall be as follows:

| | |
|---|---|
| 1st six (6) months: | 60% of journeyman (base) wages |
| 2nd six (6) months: | 70% of journeyman (base) wages |
| 3rd six (6) months: | 80% of journeyman (base) wages |
| 4th six (6) months: | 90% of journeyman (base) wages |
| After twenty-four (24) months: | 100% of journeyman (base) wages |

**Paragraph 5.** The ratio of journeymen to Apprentices shall be six (6) Laborer journeymen to one (1) Laborer apprentice on a company-wide basis, with no more than twenty percent (20%) of Laborers being apprentices on any one job site of the Employer.
Employers who employ a maximum of between one (1) and five (5) Laborer journeymen shall be entitled to one (1) Laborer apprentice, who may be assigned to jobsites irrespective of the twenty percent (20%) job site maximum specified in this provision.

**Paragraph 6.** Referral of apprentices will be through the Local Union with jurisdiction over the job site. Employers requesting apprentices will be assigned an apprentice by the JATC from the available apprentice pool. The JATC can limit the number of apprentices to that which is adequate for current needs and which can be properly trained by the program. Employers may recall their laid off apprentices to work, provided that the Employer complies with the ratios set forth in Paragraph 5. All apprentices must report their hours weekly to the JATC. All apprentices will be required to undergo testing by the JATC for the presence of illegal substances at the time they enter the apprentice program.

## Article XVI
## SETTLEMENT OF DISPUTES

**Paragraph 1.** Any dispute concerning the interpretation or application of this Agreement between an Employer and the Union shall be adjusted by the particular Employer and Union, in the first instance. Jurisdictional disputes (that is, competing claims for the assignment of work) are not subject to being processed through this grievance procedure.

**Paragraph 2.** In the event that the matter is not settled, the Union may file a written grievance, which shall be submitted to a Joint Grievance Committee (hereinafter the "JGC") comprised of three (3) Employer representatives selected by MARBA and three (3) Union representatives selected by the Construction and General Laborers' District Council of Chicago and Vicinity, which shall convene monthly. The JGC shall adopt its own rules of procedure. The Union must file the grievance within forty-five (45) days of the date of the occurrence giving rise to the grievance or when the affected employee knew or reasonably should have known of the existence of the grievance. Grievances not filed within the forty-five (45) day period are deemed waived and are not subject to being processed through this procedure. The determination of the JGC shall be governed by majority vote, provided that the Employer representatives and Union

representatives shall have equal voting power. If decided by majority vote, the grievance deter-
mination and any relief determined to be appropriate shall be final and binding upon all parties.

Laborers who prevail in their grievances shall be compensated for two (2) hours lost time
to attend the JGC Grievance hearing. Grievances shall be dismissed if the grievant fails to ap-
pear at the scheduled hearing and no continuance is granted by the JGC.

**Paragraph 3.** In the event that the JGC is deadlocked upon the disposition of a griev-
ance, then the Union or the Employer may refer the matter to arbitration by so notifying the other
within thirty (30) days of the date of the JGC decision. The moving party shall obtain a list of
seven (7) arbitrators from the Federal Mediation and Conciliation Service, provided that all arbi-
trators maintain their principal office in the Chicago area. The party selected by lot shall strike
the first name from the list, then parties shall alternately strike names from the list until one arbi-
trator remains.

**Paragraph 4.** The decision of the arbitrator shall be final and binding upon all parties.
The arbitrator shall not be empowered to amend, alter or add to this Agreement. The arbitrator's
expenses shall be jointly paid by the Employer and the Local Union between whom the griev-
ance exists.

**Paragraph 5.** Any party who fails to comply with an award within seven (7) days' no-
tice of an arbitrator's award or the JGC determination shall be responsible for an additional ten
percent (10%) liquidated damages on any monetary award and all court costs and reasonable at-
torney fees actually incurred by the party enforcing the award.

**Paragraph 6.** With regard to this Article, the Union reserves its right, and it shall not be
a violation of this Agreement, for the Union to strike, picket and/or withdraw its employees from
any Employer who fails to pay wages or fringe benefits as required under this Agreement. Ex-
cept as provided in this Article, there shall be no strike, slowdown, withdrawal of men or other
concerted refusal to work by the Union or the employees during the term of this Agreement.
Further, there shall be no lockout by the Employer. The Employer further agrees that no punitive
action shall be taken against its employees if said employees refuse to cross a picket line that
may be placed on the job or project of their employer.

### Article XVII
### BRANCHES OF WORK

**Paragraph 1.** The classifications of Employees covered by this Agreement doing the
work falling within jurisdiction of this Union shall be used in performing all common labor at the
building or site, in connection with masonry and carpentry or such other work as may be directed
by the Employer, his foreman or agent.

**Paragraph 2.** The Employer shall not engage his labor on a piece-work basis.

**Paragraph 3.** The Employer shall furnish all tools and shovels required for the work, also boots and rain equipment required for the protection of the workers in the trade and the worker shall be held responsible for same.

**Paragraph 4. RECOGNITION OF BARGAINING REPRESENTATIVE:** Employer hereby agrees to recognize the Union as the exclusive representative of all its employees performing work within the jurisdiction of the Union for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, and also confirms the jurisdiction of this Union over the branches of work covered herein, and agrees not to enter into any agreement with other labor organizations covering such branches of work.

In the event of a jurisdictional dispute over any of the work covered under this Agreement that cannot be adjusted by both parties to this Agreement and the contending party, and if a binding authority recognized by the Union determines the work to be definitely the jurisdiction of some other union, then the parties shall jointly abide by such determination; provided that in the event the decision is appealed by the Union, this provision shall not be applicable until such time as the final decision issues.

**Paragraph 4(a). BRANCHES OF WORK COVERED HEREIN:** The building of all scaffolding, runways and windbreaks for concrete and mason work, rigging for caissons and concrete chutes and hoppers, digging, lagging, sheeting and dewatering of foundation piers and caissons; concrete work within the walls of any building or jobs; the rubbing and grinding of concrete installations where no patching is involved; boxing for concrete footing, raising, moving, shoring of all buildings, back fillings and gradings; also all laboring work in connection with cement sidewalks, curbs or gutters, stone curbs, streets, alleys, driveways, viaducts, retaining walls, slate, tile and asbestos roofing; also all laboring work connected with composition floor work, rock asphalt, whether done by hand or by any other process, wrecking and stripping of concrete forms and false work, tending to carpenters, tending to salamanders; removal, clearing and cleaning of all debris, signalman and handling of such materials for construction as directed by the Employer; also building in centering for fire proofing; gunite work in handling of cement gun nozzle, when gunite is applied of a thickness of one and one-half (1½) inches or more, all laboring work in connection with original installation of landscaping in connection with new construction of all types, also all laboring work in connection with boiler setting, including the installation of plastic or other non-solid refractory materials. The coverage of this agreement, in referring to the type of work hereunder, includes in addition to all other types of construction, the construction and alteration of all track work and the construction, alteration and maintenance over track work on property on which a railroad company does not have a property right; in short, all unskilled labor connected with work undertaken by members of the Employer and the handling of all materials, or appliances in any trade where it will be more economical to have the work done by Laborers as may be decided by the Employer, subject to appeal to the decision of the Joint Grievance Committee.

**Tenders:** Tending masons, plasterers, carpenters and other building and construction crafts.

Tending shall consist of preparation of materials and handling and conveying of materials to be used by mechanics or other crafts, whether such preparation is by hand or any other process. After the material has been prepared, tending shall include the supplying and conveying of said material, and all other materials to such mechanic, whether by silo mixer, bucket, hod, wheelbarrow, buggy, or any motorized unit used for such purpose, bobcats, and uniloaders for cement masons and concrete contractors, forklifts for brick masons and/or any other machine which replaces the wheelbarrow or buggy.

Unloading, handling, and distributing of all materials, fixtures, furnishings, furniture, and appliances whether crated or uncrated from point of delivery to stockpiles and from stockpiles to approximate point of installation.

Drying of plaster, concrete, mortar or other aggregate when done by salamander heat or any other drying process.

Cleaning and clearing of all debris and recycled material, including wire brushing of windows, scraping of floors, removal of surplus material from all fixtures within confines of structures and clearing of all debris in building and construction area. The general cleanup, including sweeping, cleaning, washdown and wiping of construction facility, equipment and furnishings and removal and loading or burning of all debris including crates, boxes, packagings, and packaging waste materials. Washing or cleaning of walls, partitions, ceilings, windows, bathrooms, kitchens, laboratory, and all fixtures and facilities therein. Cleanup, mopping, washing, waxing and polishing or dusting of all floors or areas.

The aging and curing of concrete, mortar and other materials applied to walls, floors, ceilings and foundations of buildings and structures, highways, airports, overpasses, tunnels, bridges, approaches, viaducts, ramps, or other similar surfaces by any mode or method.

All fire watch, hole watch, and confined space entry watch for the above-mentioned craft. Firestopping, fireproofing beams, ceilings, walls and floors with all forms of fire prevention materials.

Safety and deck monitoring.

**Scaffolds:**  Erection, planking, maintenance and removal of all scaffolds and windbreaks for lathers, plasterers, bricklayers, masons and other construction trade crafts. Building planking or installation and removal of all staging, swinging, tubular and hanging scaffolds, including maintenance thereof.

**Excavations and Foundation-Site Preparation and Clearance For Transportation and Transmission Lines:**  Excavation for building and all other construction; digging of trenches, piers, foundations and holes; digging, lagging, sheeting, cribbing, bracing and propping of foundations, holes, caissons, cofferdams, dams, dikes and irrigation trenches, canals and all handling, filling and placing of sand bags connected therewith. All drilling, blasting and scaling on the site or along the right of way, as well as access roads, reservoirs, including areas adjacent or pertinent to construction site; installation of temporary lines.

Preparation and compacting of roadbeds for railroad track laying, highway construction and the preparation of trenches, footings, etc., for cross-country transmission by pipelines or electric transmission or underground lines or cables.

On-site preparation and right-of-way clearance for construction of any structures or the installation of traffic and transportation facilities such as highways, pipelines, electrical transmission lines, dam sites and reservoir areas, access roads, etc. Clearing and slashing of brush or trees by hand or with mechanical cutting methods. Blasting for all purposes such as stumps, rocks, general demolition. Falling, bucking, yarding, loading or burning of all trees or timber on construction areas. Choker setters, off-bearers, lumber handlers and all Laborers connected with on-site portable sawmill operations connected with clearing. Erection, dismantling and/or reinstallation of all fences. Cleanup of right-of-way, including tying on, signaling, stacking of brush, trees or other debris, and burning where required. All soil tests, operations of semi and unskilled labor, such as filling of sand bags, handling timber and loading and unloading of same; All GPS equipment and lasers, and grade checking

**Concrete, Bituminous Concrete and Aggregates:** (a) Concrete, bituminous, concrete or aggregate for walls, footings, foundations, floors or for any other construction. Mixing, handling, conveying, pouring, vibrating, guniting and otherwise placing concrete or aggregate, whether done by hand or any other process. Wrecking, stripping, dismantling and handling concrete forms and false work. Building of centers for fire proofing purposes. Operation of motorized wheelbarrows or buggies or machines of similar character, whether run by gas, diesel or electric power. When concrete or aggregates are conveyed by crane or derrick, or similar methods, the hooking on, signaling, dumping and unhooking the bucket. Placing of concrete or aggregates, whether poured, pumped, gunited, or placed by any other process. The assembly, uncoupling of all connections and/or parts of, to equipment used in mixing or conveying concrete, aggregate, or mortar, and the cleaning of such equipment, parts and/or connections. All vibrating, grinding, spreading, flowing, rodding, leveling and strike-off of concrete or aggregates by floating, puddling or screening by hand or mechanical means prior to finishing. Where prestressed or pre-cast concrete slabs, walls, or sections are used, all loading, unloading, stockpiling, hooking on, signaling, unhooking, setting and barring into place of such slabs, walls or sections. All mixing, handling, conveying, placing and spreading of grout for any purpose. Green cutting of concrete or aggregate in any form, by hand, mechanical means, grindstones or air or water.

(b)    The filling and patching of voids, crevices, etc., to correct defects in concrete caused by leakage, bulging, sagging, etc.

(c)    The loading, unloading, carrying, distributing and handling of all rods, mesh and material for use in reinforcing concrete construction. The hoisting of rods, mesh and other material for use in reinforcing concrete construction. The hoisting of rods, mesh and other materials except when a derrick or outrigger by other than hand power is used.

(d)    All work on interior concrete columns, foundations or engine and machinery beds.

(e)   The stripping of forms, other than panel forms which are to be re-used in their original form, and the stripping of forms on all flat arch work.

The moving, cleaning, oiling and carrying of all forms to the next point of erection.

The snapping of wall ties and removal of tie rods.  Handling, placing and operation of the hoses and pots or hoppers on sand blasting or other abrasive cleaning.  The jacking of slip forms, and all semi and unskilled work connected therewith.

**Streets, Ways and Bridges:**  Work, in the excavation, preparation, concreting, asphalt, bituminous concrete and mastic paving, ramming, curbing, flagging and surfacing of streets, striping, street markings and other pavement markings, Laborers engaged in layout work, cleanup and helping painters involved in any pavement markings, ways, courts, underpasses, overpasses, bridges, approaches and slope walls and the grading and landscaping thereof and all other labor connected therewith.  Cleaning, grading, fence or guard rail installation and/or removal for streets, highways, roadways, aprons, runways, sidewalks, parking areas, airports, approaches and other similar installations.  Preparation, construction and maintenance of roadbeds and sub-grade for all paving, including excavation, dumping and spreading of sub-grade material, ramming, or otherwise compacting.  Setting, leveling and securing or bracing of metal or other road forms and expansion joints, including placing of reinforcing mats, or wire mesh, for the above work.  Loading, unloading, placing, handling and spreading of concrete aggregate or paving material, including leveling of the surface.  Strike-off of concrete, when used as paving material by hand and floating or mechanical screening for strike-off.  Cutting of concrete for expansion joints and other purposes.  Setting of curb forms and the mixing, pouring, cutting, flowing, and strike-off of concrete used therefor.  The setting, leveling and grouting of all pre-cast concrete or stone curb sections.  Installation of all joints, removal of forms and cleaning, stacking, loading, oiling and handling.  Grading and landscaping in connection with paving work.  All work in connection with loading, unloading, handling, signaling, slinging and setting of all paving blocks, riprap or retaining walls such as stone, wood, metal, concrete or other material and the preparation of surfaces to receive same.

**Concrete and Asphalt Testing and Quality Control.**  All work in connection with quality assurance/quality control and the collection and testing of construction materials and soil samples for the purposes of quality control/quality assurance.  (Concrete and Asphalt Testing and Quality Control shall not be subject to the subcontracting restrictions in Article VII).

**Trenches, Manholes, Handling and Distribution of Pipe, Etc.:**  Cutting of streets and ways for laying of pipe, cables or conduits for all purposes; digging of trenches, manholes, etc., handling and conveying all materials; concreting, back-filling, grading and resurfacing and all other labor connected therewith.  Clearing and site preparation as described herein.  Cutting or jackhammering of streets, roads, sidewalks or aprons by hand or the use of air or other tools.  Digging of trenches, ditches and manholes and the leveling, grading and other preparation prior to laying pipe or conduit for any purpose.  Loading, unloading, sorting, stockpiling, wrapping, coating, treating, handling and distribution of water mains to the first joint from the building, gas mains, and all pipe, including placing, setting and removal of skids.  Cribbing, driving or sheet

piling, lagging and shoring of all ditches, trenches and manholes. Handling, mixing or pouring concrete and handling and placing of other materials for saddles, beds or foundations for the protection of pipes, wires, conduits, etc. Backfilling and compacting of all ditches, resurfacing of roads, streets, etc. and/or restoration of lawns and landscaping.

**Shafts and Tunnels, Subways and Sewers:** Construction of sewers, shafts, tunnels, subways, caissons, cofferdams, dikes, dams, levies, aqueducts, culverts, floor control projects and airports. All underground work involved in mines, underground chambers for storage or other purposes, tunnels or shafts for any purpose, whether in free or compressed air. Drilling and blasting, mucking and removal of material from the tunnels or shafts. The cutting, drilling and installation of material used for timbering, or retimbering, lagging, bracing, propping or shoring the tunnel or shaft. Assembly and installation of multiplate, liner plate, rings, mesh, mats or forms for any tunnel or shaft including the setting or rods for same. Pouring, pumps-creting or guniting of concrete in any tunnel or shaft operation, manual or hydraulic jacking of shields and the use of such other mechanical equipment as may be necessary.

Excavation or digging and grading of footings and foundations for bridges, overpasses, underpasses, aqueducts, etc., and their approaches. All concrete work as described above and in addition, the hooking on, signaling and dumping of concrete for treme work over water on caissons, pilings, abutments, etc. Excavation, grading, grade preparation and landscaping of approaches. Installation of pipe, gratings and grill work for drains or other purposes. Installation of well points or any other dewatering system.

**Compressed Air:** In compressed air all work underground or in compressed chambers, including tending of the outer air lock. All work in compressed air construction including, but not limited to, groutmen, trackmen, blasters, shield drivers, miners, brakemen, miner's helpers, lock tenders, mucking machine operators, mortar men, gauge tenders, rodmen, compressed air electricians, setting of line plate and ring sets, drill runners, powermen or blasters, air hoist operators; form men; concrete blower operators, cement (invert) operators, power knife operators, erector operators, keyboard operators, pebble placer operators, car pushers, grout machine operators, steel setters, cage tenders, skinner track layers, dumpmen, diamond drillers, timbermen and re-timbermen, cherry pickmen, nippers, chucktenders and cable tenders, vibratormen, jetgunmen, gunite, nozzlemen, gunmen, reboundmen and all other work connected therewith.

**Sewer, Drains, Culverts and Multiplate:** Unloading, sorting, stockpiling, wrapping, coating, treating, handling, distribution and lowering or raising of all pipe or multiplate. All digging, driving of sheet piling, lagging, bracing, shoring and cribbing, breaking of concrete, backfilling, tamping, resurfacing and paving of all ditches in preparation for the laying of pipe. Pipe laying, leveling, and making of the joint of any pipe used for main or side sewers and storm sewers. All of the laying of clay, terra cotta, iron-stone, vitrified concrete or other pipe and the making of joints for main or side sewers and storm sewers and all pipe for drainage. Unloading, handling, distribution, assembly in place, bolting and lining up of sectional metal or other pipe including corrugated pipe. Laying of lateral sewer pipe from main sewer or side sewer to building or structure, except that Employer may direct that this work be done under proper supervision. (Referee Hutcheson's decision). Laying, leveling and making of the joint of all multi-cell conduit or multi-purpose pipe. Cutting of holes in walls, fittings, piers or other obstructions for

the passage of pipe or conduit for any purpose and the pouring of concrete to secure said holes. Digging under streets, roadways, aprons or other paved surfaces for the passage of pipe, by hand, earth auger or any other method and manual and hydraulic jacking of pipe under said surfaces. Installation of septic tanks, cesspools and drain fields.

**Inspection, Maintenance and Repair of Underground Utilities, and Sewers:** All underground and preparatory work, which includes televised inspections, telegrouting, root cutting, herbicide application, lining, vacuuming, vacuum excavation, and jetting, in new or existing utilities, water mains, structures, shafts, tunnels, sewers, drains, pipes and related structures of every character and description; all work performed on the ground when excavating with a vac-truck.

**Underpinning, Lagging, Bracing, Propping and Shoring.** Underpinning, lagging, bracing, propping and shoring, raising and moving of all structures; raising of structure by manual or hydraulic jacks or other methods. All work on house moving, shoring and underpinning of structures, loading, signaling, right- of-way clearing along the route of movement. Resetting of structure in new location to include all site clearing, excavation for foundation and concrete work. Cleanup and backfilling, landscaping old and new site.

**Drilling and Blasting.** All work of drilling jackhammering and blasting. Operation of all rock and concrete drills, including handling, carrying laying out of hoses, steel handling, installation of all temporary lines and handling and laying of all blasting mats. All work in connection with blasting, handling and storage of explosives carrying to point of blasting, loading holes, setting fuses, making primers and exploding charges. All securing of surfaces with wire mesh and any other material and setting of necessary bolts and rods and anchor same. All high scaling and other rock breaking and removal after blast. Handling and laying of nets and other safety devices and signaling, flagging, road guarding.

**Signalmen:** Signalmen on all construction work defined herein, including traffic control signalmen at construction site.

**General Excavation and Grading:** The clearing, excavating, filling, backfilling, grading and landscaping of all sites for all purposes and all labor connected therewith, including chairmen, rodmen, grade markers, etc.

**Factories:** All work in factories, mills, power stations, oil refineries, chemical plants and industrial plants performed now or as may be acquired hereafter, including packers, cutters, loaders, raw material unloaders, checkers, stuffers, production line personnel and stenciling of materials. Handling of raw pigment; vessel cleaners and/or dryers; washing or cleaning laboratory glassware; stocking of materials in laboratories; the cleaning and/or scrubbing, washing, polishing of all floors, glasses, windows, walls, rest rooms and furniture. All fire watch attendants when multi-craft personnel are used, and all general area firewatch. Attendants for all confined space entry when multi-craft personnel are used. All attendants for foreign material exclusion when single or multi-craft are used.

**General:**  Material yards, junk yards, asphalt plants, concrete products plants, cemeteries, landscape nurseries and the cleaning or reconditioning of streets, ways, sewers and water lines and all maintenance work and work of an unskilled and semi-skilled nature, including Laborers in shipyards, tank cleaners, ship scalers, shipwright helpers, watchmen, flagmen, guards, security and safety men, toolroom men, park, sports area and all recreational center employees, utilities employees, horticultural and agricultural workers, garbage and debris handlers and cleaner.

**Pits, Yards, Quarries, Etc.:**  All drillers, blasters and/or powdermen, nippers, signal-men, laborers in quarries, crushed stone yards and gravel and sand pits and other similar plants, including temporary and portable batching plants.

**Wrecking:**  The wrecking or dismantling of buildings and all structures, breaking away roof materials, beams of all kinds, with use of cutting or other wrecking tools as necessary. Burning or otherwise cutting all steel structural beams.  Breaking away, cleaning and removal of all masonry and wood or metal fixtures for salvage or scrap.  All hooking on and signaling when materials for salvage or scrap are removed by crane or derrick.  All loading and unloading of ma-terials carried away from the site of wrecking.  All work in salvage or junk yards in connection with cutting, cleaning, storing, stockpiling or handling of materials.  All clean-up removal of de-bris, burning, backfilling and landscaping of the site of wrecked structures.

**Railroad Track Work.**  Right-of-way clearance as described above, excavation, grading, subgrading, ballasting and compacting of right-of-way.  Loading, unloading, stockpiling, han-dling and distribution of track and ties and placing of or jacking track and ties at point of installa-tion.  All burning or otherwise cutting of track.  Setting of tie plates, bolting, leveling, and gaug-ing of rails and all spiking, whether by hand or mechanical means.  Placing and tamping of bal-last by hand or mechanical means.  Construction and/or relocation of main line, shoe flies, sid-ings, gradings, crossings, relocating of pipes and drainage and culverts and connected with same and removal and replacing of all fences.

**Studio Utility Employees:**  All such work as herein described as may be pertinent to and part of the operation of Motion Picture and other related type of studios.

**Use of Tools:**  Operation of all hand, pneumatic, electrical, motor, combustion or air-driven tools or equipment necessary for the performance of work described herein.  In short, all unskilled labor connected with work undertaken by members of the party of the first part, and the handling of all materials or appliances in any trade where it will be more economical to have the work performed by Laborers as may be decided by the Employer, subject to appeal to and deci-sion of the Joint Grievance Committee.

**Miscellaneous:**  All such work and jurisdiction as may have been acquired by reason of amalgamation or merger with former national or international Unions and as may be hereafter acquired; including all such work and jurisdiction as declared by actions of the Executive Coun-cil or conventions of the American Federation of Labor.

**Paragraph 5.  WORK NOT INCLUDED:**  The laboring work not included in this Agreement is general excavating for buildings to the bottom of floor level.  If there are any sub-

basements or cellars, this general excavation shall be considered to extend to the bottom of the floor, of same. Excavation in basement and sub-basements other than by power equipment shall be done by Laborers at Building Laborers' rate (except where caisson rates apply).

**Paragraph 6. WRECKING:** Where a building is only partially wrecked and parts torn down for the purpose of building additions, alterations, remodeling, or repairing same, such work is covered by this Agreement, and rates as established herein shall apply.

**Paragraph 6(a). WRECKING: COMPLETE DEMOLITION:** Work pertaining to wrecking of buildings and structures in their entirety and removed to the basement floor level is covered by the Agreement between Local No. 225 of the Laborers' District Council and the Labor Committee representing the Wrecking Industry of Chicago and Vicinity, and the rates established by said Agreement shall apply.

**Paragraph 7. FLYING FORMS:** Laborers shall tend the Carpenters when prefabricating the Flying Forms on the ground.

When Flying Forms are used on each floor, Laborers shall assist in the placing of Steel Tubular Scaffolding and Flying Forms.

When Concrete Floors are poured and Flying Forms are removed, Laborers will assist.

Laborers will clean and oil Flying Forms after each concrete pour.

After the last concrete pour, when Flying Forms will not be re-used on job site, Laborers will remove, clean and dismantle, oil and place in a stockpile.

## Article XVIII
## ALCOHOL AND SUBSTANCE ABUSE

The parties incorporate the CISCO Uniform Drug/Alcohol Abuse Program, as modified, attached hereto as Addendum.

It is recognized that some client owners require additional substance abuse procedures to be followed on their projects for all trades, and it shall not be a violation of this agreement for signatory employers to comply with such procedures, provided prior written notification is given to the District Council.

## Article XIX
## PRE-JOB CONFERENCES

If the Union elects, a pre-job conference prior to commencement of work shall be held or if need is for additional men after the job has started, then the conference shall be held before the additional hiring commences if the Union elects. At the pre-job conference, the Employer shall

advise the Union of its requirements as to workmen required in the respective classifications, the probable starting date, duration of the job, subcontractors, and working schedules.

## Article XX
## APPROVALS

**Paragraph 1.** It is mutually agreed that the Construction and General Laborers' District Council of Chicago and Vicinity shall, in writing, by an authorized officer, approve and guarantee the fulfillment of all the provisions of this Agreement.

**Paragraph 2.** Inasmuch as the employment of Laborers is directly affected by the hours of employment of Carpenters, Bricklayers, Plasterers, Cement Masons and Hoisting Engineers engaged in construction, it is agreed that should the trades change their work day or work week, other than provided in this Agreement, either party hereto shall have the right upon ten (10) days' written notice through United States Registered Mail Delivery, to amend this Agreement to meet such conditions of employment.

**Paragraph 3. SAVINGS CLAUSE:** Any provisions contained herein which is contrary to or held to be in violation of any State or Federal Law shall be void and of no force or effect, and this Contract shall be construed as though such void provision were not a part hereof, it being intended that the other provisions of this Contract shall not be affected thereby.

**Paragraph 4. EMPLOYER'S WARRANTY:** The signatory Associations and its bargaining association represent and warrant that they are the bargaining agents of all the individual Employers of the signatory Associations who are now or hereafter become members of said signatory Associations and who assign to one or more of the Associations full authority to negotiate and execute this Agreement.

**Paragraph 5. EXECUTION:** It is expressly agreed and understood that execution of this Agreement by authorized representatives of the signatory Associations shall be conclusively presumed sufficient legal execution by all individual contractors represented by said Associations and that individual executions are not required for this Agreement to be binding on such Contractors.

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY

By: _____, Business Manager

By: _____, President/Secretary-Treasurer

BUILDERS' ASSOCIATION

MASON CONTRACTORS' ASSOCIATION OF
GREATER CHICAGO

LAKE COUNTY CONTRACTORS ASSOCIATION

BY THE MID-AMERICA REGIONAL BARGAINING ASSOCIATION

By: _____

David H. Lorig

## ADDENDUM

## CONSTRUCTION INDUSTRY SERVICE
## CORPORATION JOINT LABOR-MANAGEMENT
## UNIFORM DRUG/ALCOHOL ABUSE PROGRAM

### I.  Policy Statement

The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. (Company Name), and the signatory unions seek to protect people and property, and to provide a safe working environment. The purpose of the following program is to establish and maintain a drug free, alcohol free, safe, health work environment for all of its employees.

### II.  Definitions

    a.  **Company Premises** - The term "Company Premises" as used in this policy includes all property, facilities, land, buildings, structures, automobiles, trucks and other vehicles owned, leased or used by the company. Construction job sites for which the company has responsibility are included.

    b.  **Prohibited Items & Substances** - Prohibited substances include illegal drugs (including controlled substances, look alike drugs and designer drugs), alcohol beverages, and drug paraphernalia in the possession of or being used by an employee on the job.

    c.  **Employee** - Individuals, who perform work for (Company Name), including, but not limited to, management, supervision, engineering, craft workers and clerical personnel.

    d.  **Accident** - Any event resulting in injury to a person or property to which an employee, or contractor/contractor's employee, contributed as a direct or indirect cause.

    e.  **Incident** - An event which has all the attributes of an accident, except that no harm was caused to person or property.

    f.  **Reasonable Cause** - Reasonable cause shall be defined as excessive tardiness, excessive absenteeism, and erratic behavior such as noticeable imbalance, incoherence, and disorientation.

### III.  Confidentiality

a.  All parties to this policy and program have only the interest of employees in mind, therefore, encourage any employee with a substance abuse problem to come forward and voluntarily accept our assistance in dealing with the illness. An employee assistance program will provide guidance and direction for you during your recovery period. If you volunteer for help, the company will make every reasonable effort to return you to work upon your recovery. The company will also take action to assure that your illness is handled in a confidential manner.

b.  All actions taken under this policy and program will be confidential and disclosed only to those with a "need to know".

c.  When a test is required, the specimen will be identified by a code number, not by name, to insure confidentiality of the donor. Each specimen container will be properly labeled and made tamper proof. The donor must witness this procedure.

d.  Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

e.  The handling and transportation of such specimen will be properly documented through the strict chain of custody procedures.

### IV.  Rules - Disciplinary Actions - Grievance Procedures

1.  *Rules* - All employees must report to work in a physical condition that will enable them to perform their jobs in a save and efficient manner. Employees shall not:

a.  Use, possess, dispense or receive prohibited substances on or at the job site; or

b.  report to work with any measurable amount of prohibited substances in their systems.

2.  *Discipline* - When the company has reasonable cause to believe an employee is under the influence of a prohibited substance, for reasons of safety, the employee may be suspended until test results are available. If no test results are received after three (3) working days, the employee, if available, shall be returned to work with back pay. If the test results prove negative, the employee shall be reinstated with back pay. In all other cases:

a.  Applicants testing positive for drug use will not be hired.

b.  Employees who have not voluntarily come forward, and who test positive for drug use, will be terminated.

c.    Employees who refuse to cooperate with testing procedures will be terminated.

d.    Employees found in possession of drugs or drug paraphernalia will be terminated.

e.    Employees found selling or distributing drugs will be terminated.

f.    Employees found under the influence of alcohol while on duty, or while operating a company vehicle, will be subject to termination.

3.    *Prescription Drugs* - Employees using prescription medication which may impair the performance of job duties, either mental or motor functions, must immediately inform their supervisors of such prescription drug use. For the safety of all employees, the company will consult with you and your physician to determine if a re-assignment of duties is necessary. The company will attempt to accommodate your needs by making any appropriate re-assignment. However, if a re-assignment is not possible, you will be placed on temporary medical leave until released as fit for duty by a prescribed physician.

4.    *Grievance* - All aspects of this policy and program shall be subject to the grievance procedure contained in the applicable collective bargaining agreement.

## V.    Drug/Alcohol Testing

The parties to this policy and program agree that under certain circumstances, the company will find it necessary to conduct drug and alcohol testing. While "random" testing is not necessary for the proper operations of this policy and program, it may be necessary to require testing under the following conditions:

a.    A pre-employment drug and alcohol test may be administered to all applicants for employment. Employees recalled to work by an Employer, and employees referred to an Employer by the Union who are requested to be tested, shall be compensated at their regular hourly rate of pay for the time required in such testing;

b.    A test may be administered in the event a supervisor has a reasonable cause to believe that the employee has reported to work under the influence, or is or has been under the influence while on the job; or has violated this drug policy. During the process of establishing reasonable cause for testing, the employee has the right to request his on-site representative to be present;

c.    Testing may be required if an employee is involved in a workplace accident/incident or if there is a workplace injury;

d.    Testing may be required as apart of a follow-up to counseling or rehabilitation for substance abuse, for up to a one (1) year period.

Each employee will be required to sign a consent and chain of custody form, assuring proper documentation and accuracy. If an employee refuses to sign a consent form authorizing the test, ongoing employment by the company will be terminated.

Drug testing will be conducted by an independent accredited laboratory (National Institute on Drug Abuse and/or College of American Pathology), and may consist of either blood or urine tests, or both as required. Blood tests will be utilized for post accident investigation only.

The company will bear the costs of all testing procedures.

## VI. Rehabilitation and Employee Assistance Program

Employees are encouraged to seek help for a drug or alcohol problem before it deteriorates into a disciplinary matter. If an employee voluntarily notifies supervision that he or she may have a substance abuse problem, the company will assist in locating a suitable employee assistance program for treatment, and will counsel the employee regarding medical benefits available under the company or union health and welfare/insurance program.

If treatment necessitates time away from work, the company shall provide for the employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An employee who successfully completes a rehabilitation program shall be reinstated to his/her former employment status, if work for which he/she is qualified exists.

Employees returning to work after successfully completing the rehabilitation program will be subject to drug tests without prior notice for a period of one year. A positive test will then result in disciplinary action as previously outlined in this policy and program.

MARBA Bldg 2001-2006 FINAL 101501.wpd